**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————
                                                          :
JENNIFER L. FARGIONE and                :          CIVIL ACTION
JUDY L. PAVELKO, In their own right and :
as Co-Administrators for the Estate of     :
CAROL L. WILLIAMS, Deceased,           :
                              Plaintiffs,        :          NO. 16-5878
                                                          :
       v.                                             :
                                                          :
EDWARD SWEENEY, et al.,                   :
                              Defendants.      :
———————————————————————:

Henry S. Perkin, M.J.                                                      February 22, 2019

**<u>MEMORANDUM</u>**

This matter is before the Court on two Motions for Summary Judgment. The first

motion was filed by the County of Lehigh, retired County Director of Corrections Edward

Sweeney, Lehigh County Prison Warden Janine Donate, former Lehigh County Prison

Supervisor Lieutenant Robert Dreisbach, and Corrections Officers Karen Chandler and Theresa

Rodger (collectively "Correctional Defendants"). The second motion is filed by the medical

provider for Lehigh County Prison, PrimeCare Medical, Inc., PrimeCare's Clinical Director Jen

Mroz, Pa-C, PrimeCare's Health Services Administrator Nicole Heffner, and a member of

PrimeCare's medical staff, Frances Brigidi, R.N. (collectively "Medical Defendants"). Both the

Medical Defendants and Correctional Defendants, except Lehigh County and PrimeCare, have

been sued individually and in their official capacities.

## I.     **<u>FACTS.</u>**

### **<u>Carol Williams' Incarceration on February 9, 2014</u>**

This matter arises from the most recent incarceration of Plaintiff Decedent Carol L.

Williams (hereinafter "Inmate Williams") at the Lehigh County Jail (hereinafter "LCJ"). On

February 9, 2014, Inmate Williams was incarcerated at LCJ on a parole violation. On March 3,

2014, a *Gagnon* II hearing was held in the Court of Common Pleas of Lehigh County on Inmate

Williams' parole violation and she was sentenced to serve the balance of the original sentence.

Upon intake to LCJ, Inmate Williams identified Americus Pharmacy as to where she received her

currently prescribed medications. Americus Pharmacy produced records in response to a

subpoena issued in this litigation. The last filled prescription for asthma medication was for a

Ventolin inhaler, as well as an Albuterol inhaler, on February 1, 2013.

       After the receiving screening, Ms. Williams was referred to Co-Defendant Physician

Assistant Jennifer Mroz (hereinafter "PA-C Mroz") for evaluation of her chronic conditions. PA-

C Mroz evaluated Inmate Williams on February 10, 2014, at 15:13. An order was placed by PA-

C Mroz for Inmate Williams to receive Albuterol Nebulizer Treatments four times per day, as

needed. Inmate Williams' history was significant for crack cocaine use, hypertension,

hypercholesterolemia, asthma, obesity, bipolar disease, and anxiety. PA-C Mroz prescribed

Albuterol mini nebulizer treatments. Mini nebulizer treatments are performed in the medical

department and not the inmate housing unit. Treatments are documented on a Nebulizer Flow

Sheet. The medication in an Albuterol nebulizer treatment is the same medication as in

an inhaler, just administered in a different way. Generally, the nebulizer treatments are

prescribed initially to treat patients with a history of asthma.

       Inmate Williams had a breathing treatment on February 15, 2014, at 16:17. After

receiving the treatment, Inmate Williams' oxygen saturation level had increased from 95% to

98%. Ms. Williams had decreased wheezing post-treatment in the right lung and no wheezing in

the left lung.  Inmate Williams had a breathing treatment on February 16, 2014, at 15:16.  She had wheezing before the treatment and an oxygen saturation level of 95%. After the treatment, her lungs were clear in all fields and her oxygen saturation level was 99%.  Inmate Williams had a breathing treatment on March 9, 2014, at 14:46.  She had wheezing prior to the treatment with an oxygen saturation level of 96%.  After the treatment, Inmate Williams' lungs were clear and her oxygen saturation level was 97%.  Inmate Williams had a physical on March 12, 2014. Her lungs were noted as: "normal, CTAB (clear to auscultation bilaterally), breath sounds are equal, no diminished breath sounds" and a peak flow of 400 which was higher than at intake.

Inmate Williams was evaluated by Kenneth Wloczewski, D.O. on March 20, 2014, in the chronic care clinic to assess her asthma.  Her lungs were clear to auscultation. Dr. Wloczewski assessed Inmate Williams' asthma as being mild and intermittent.  He scheduled Inmate Williams for follow up in 90 days.   It was noted that she smoked one pack of cigarettes per day.

Inmate Williams received a breathing treatment on May 6, 2014.  Her lungs were clear post-treatment and her oxygen saturation levels remained at 98%.  She was evaluated by Megan Hughes, PA-C as part of the chronic care clinic to assess her asthma.  She had no complaints of chest pain, shortness of breath or dizziness.  Her lungs were clear to auscultation.  Ms. Hughes assessed Inmate Williams' asthma was being mild and intermittent.

Inmate Williams received a breathing treatment on July 29, 2014.  She had gone almost three full months between breathing treatments.  Her lungs were clear after her treatment and her oxygen saturation levels had increased from 94% to 97%.

Inmate Williams was evaluated by PA-C Mroz, as part of the chronic care clinic to assess her asthma on September 12, 2004.  Inmate Williams' lungs were clear to auscultation and she

had no breathing complaints.

**November 11, 2014 Breathing Treatment**

Defendant Corrections Officer Karen Chandler (hereinafter "CO Chandler") worked the 11:00 p.m. to 7:00 a.m. shift from November 10, 2014 to November 11, 2014 on Housing Unit 4C, where Inmate Williams was housed.  During that shift, Inmate Williams stopped CO Chandler and said she needed a breathing treatment.  CO Chandler returned to the booth, called the medical department, and got the okay to send Inmate Williams to medical.  Inmate Williams went to medical at 11:42 p.m. on November 10, 2014 and returned to Housing Unit 4C at 12:03 a.m. on November 11, 2014.  CO Chandler generally calls medical for everything.

Inmate Williams had wheezing before the treatment, but her lungs were clear after the treatment and her oxygen saturation level remained at 98%.  Inmate Williams went approximately three and one half months between breathing treatments.

**November 11, 2014 - 3:00 p.m. to 11:00 p.m. Shift**

Defendant Corrections Officer Theresa Rodger (married name "Williams" and identified in the records as CO Williams) (hereinafter "CO Rodger") worked the 3:00 p.m. to 11:00 p.m. shift on Housing Unit 4C, where Inmate Williams was housed, on November 11, 2014.  During the 3:00 p.m. to 11:00 p.m. shift on November 11, 2014, inmate Lucy Martinez (hereinafter "Inmate Martinez") told CO Rodger at 9:07 p.m. that she hurt her ankle.  CO Rodger called the medical department for Inmate Martinez, and CO Rodger was told to have Inmate Martinez fill out a sick call slip.  At no point on November 11, 2014 after inmates were locked in for the evening at 10:30 p.m., to the end of CO Rodger's shift at 11:00 p.m., did CO Rodger stop at Inmate Williams' cell. CO Rodger also never gave Inmate Williams a sick call slip.

CO Rodger looked in or walked past Inmate Williams' cell three times after inmates were locked in for the evening at 10:33:15 p.m. (looked in), 10:33:21 p.m. (walked past), and 10:39:17 p.m. (looked in).

**November 11, 2014 into the Morning of November 12, 2014, 11:00 p.m. to 7:00 a.m. Shift**

CO Chandler came on for the 11:00 p.m. to 7:00 a.m. shift on November 11, 2014 into November 12, 2014. During her overnight shift from 11:00 p.m. to 7:00 a.m. on November 11, 2014 to November 12, 2014, CO Chandler worked on Housing Unit 4C, where Inmate Williams was housed in Cell 7. Defendant (former) Lt. Robert Dreisbach (hereinafter "Lt. Dreisbach") was the assigned floor Sergeant on Housing Unit 4C for the 11:00 p.m. to 7:00 a.m. shift on November 11, 2014 to November 12, 2014. Lt. Dreisbach was on Housing Unit 4C from 1:00 a.m. to 1:25 a.m. on November 12, 2014. Inmate Martinez was housed in Cell 4C1-1, which is the first cell on the bottom tier at the far left, on the surveillance video. Inmate Williams was housed in Cell 4C1-7, which is the cell on the bottom tier directly to the right of the staircase, on the surveillance video.

During that shift, Inmate Ivette Cintron (hereinafter "Inmate Cintron") was in Cell 4C1-6, directly beside on the left of Inmate Williams' cell, stopped CO Chandler on her rounds complaining of constipation, stomach upset, and nausea. CO Chandler can be seen stopping at or near Inmate Cintron's cell on surveillance video at 3:48:31 a.m., 4:00:21 a.m., and 5:12:33 a.m. CO Chandler called the medical department regarding Inmate Cintron and spoke to Co-Defendant Frances Brigidi, R.N. (hereinafter "R.N. Brigidi") who told her to tell Inmate Cintron to drink more water, try not to eat bread for the day, and put in a sick call slip.

Rounds were conducted approximately every thirty minutes on Housing Unit 4C during

the 11:00 p.m. to 7:00 a.m. shift on November 11, 2014 to November 12, 2014.

**November 12, 2018 - Inmate Williams' Death**

On November 12, 2014 at approximately 7:46 a.m., Inmate Williams was found unresponsive in her cell by other inmates who were out of their cells for breakfast. Inmates on Housing Unit 4C began yelling that Inmate Williams was not breathing and Corrections Officer Van Lieu called a Code Blue.

The PrimeCare records do not demonstrate any calls from correctional officers on November 11, 2014, through the time Inmate Williams was found in her cell deceased.

A PrimeCare Medical Mortality Review was conducted on December 12, 2014 as required by NCCHC Standards and the only corrective action taken was that patients/inmates would be required to come to the medical department to sign a refusal for all refused visits. This PrimeCare corrective action was collateral to Inmate Williams' death.

An Administrative Death Review was conducted by LCJ and it was determined that no LCJ operations, policies, or procedures needed changed or improved. (Administrative Death Review, Exhibit "V", PCM01632).

**Lucy Martinez**

Inmate Martinez was incarcerated at LCJ at the same time as Inmate Williams and she met Inmate Williams in February of 2014. Inmate Martinez and Inmate Williams began dating, while at LCJ, in March of 2014 and they became engaged in July of 2014. On May 30, 2017, Inmate Martinez gave a statement indicating that on November 11, 2014 she was housed in cell 1 and Inmate Williams was housed in cell 7. Inmate Martinez' cell was diagonal from Inmate Williams' cell, approximately 20 feet away.

In her statement, Inmate Martinez says that Inmate Williams was having trouble breathing the evening of November 11, 2014 and that when CO Rodger was doing her last rounds of her shift, CO Rodger passed by Inmate Martinez' cell and Inmate Martinez told CO Rodger that Inmate Williams was having trouble breathing.

During the evening of November 11, 2014, when Inmate Martinez went in to her cell for the night at 10:30 p.m., she hit her ankle on her bunk bed. When CO Rodger walked past Inmate Martinez' cell, Inmate Martinez asked if she could go down to medical to get an ice pack. Inmate Williams and Inmate Martinez were both in their cells for the evening during the time that Inmate Martinez alleges Inmate Williams told her she was having trouble breathing.

On all occasions prior to the evening of November 11, 2014, when Inmate Williams requested a breathing treatment, the Corrections Officers would call medical and send Inmate Williams to the medical department for a breathing treatment. Inmate Martinez also received breathing treatments while in LCJ and never had any issues getting sent to the medical department when she requested a treatment. Inmate Lucy Martinez testified that she was committed to LCJ three times, and on each occasion she had a rescue inhaler and was prevented from possessing it in the Jail.

Former Director of Corrections Sweeney testified that there were no restrictions on inmate possession of rescue inhalers. Warden Donate testified that there was no specific policy with respect to rescue inhalers, that was a decision to be made by the medical provider, PrimeCare. Lt. Dreisbach testified that on certain units rescue inhalers are kept in the control booth of the unit, and that on other units inmates have them in their cells. Investigator Knappenberger was not aware of any specific policy regarding rescue inhalers, but thought there

was one somewhere.

CO Rodger testified that she was not aware of a specific policy regarding rescue inhalers, but generally understood that inmates could possess them as long as their name was written on the box. CO Chandler testified that inmates were not permitted to carry rescue inhalers and that she had never seen one on a unit.

R.N. Brigidi has worked at LCJ for approximately six years and she generally works the 10:30 p.m. to 7:00 a.m. shift. She worked 10:30 p.m. on November 11, 2014, through 7:00 a.m. on the morning of November 12, 2014. She does not recall receiving any calls from the unit where Ms. Williams was housed during her shift. R.N. Brigidi testified that inmates were not allowed to possess keep on person rescue inhalers, with the exception of federal inmates who were allowed such inhalers. PA-C Mroz testified that policies with respect to rescue inhalers varied in different PrimeCare facilities. Health Services Administrator Nicole Heffner has been with PrimeCare as a registered nurse since November 1, 2009. She was the Health Services Administrator from April 8, 2010, until February 1, 2016. She testified that she was not aware of any polices distinguishing between federal and county inmates with respect to rescue inhalers, as testified to by Nurse Brigidi. PrimeCare's corporate designee Thomas Weber testified that R.N. Brigidi was incorrect in her understanding of policies at LCJ and that there was no distinction between federal and county inmates.

Plaintiffs' only liability expert is John J. Shane, M.D. Dr. Shane is a pathologist per his CV. Dr. Shane is not board certified in internal medicine, family medicine or emergency medicine. Dr. Shane is Board Certified in Pathologic Anatomy and Clinical Pathology, and has been since 1966.

## II.    <u>PROCEDURAL HISTORY</u>.

On November 14, 2016, Plaintiffs initiated this matter by filing a Complaint. On January 30, 2017, PrimeCare filed a motion to dismiss. Plaintiffs filed a response in opposition on February 13, 2017. Pursuant to a stipulation between the parties, paragraphs 57-66 of Plaintiffs' Complaint were stricken by Order dated February 17, 2017. Based on the Stipulation and Order, the Correctional Defendants and Lehigh County filed their Answer with Affirmative Defenses on February 21, 2017.

On March 31, 2017, a Consent and Order to Jurisdiction by United States Magistrate Judge was filed and the case was transferred from the Honorable Joseph F. Leeson for all proceedings. By Memorandum and Order dated September 27, 2017, PrimeCare's Motion to Dismiss was granted in part and denied in part, and the Court issued an Amended Order on September 28, 2017 clarifying an inconsistency between the Memorandum and the Order entered on September 27, 2017.

On October 18, 2017, Plaintiffs' counsel filed a letter with the Court electing to proceed on the original Complaint as modified by the Court's September 28, 2017 Order. PrimeCare filed an Answer with Affirmative Defenses to Plaintiffs' Complaint on October 25, 2017.

A telephonic Rule 16 Scheduling Conference was held on December 20, 2017 and a Rule 16 Scheduling Order was issued the same day. An Amended Rule 16 Scheduling Order was issued on December 28, 2017.

Plaintiffs filed a Motion for Leave to File an Amended Complaint on January 19, 2018. PrimeCare filed a Memorandum of Law in Opposition on January 29, 2018. On February

5, 2018, Plaintiffs filed a Motion for Leave to File a Reply Memorandum in Further Support of their Motion for Leave to File an Amended Complaint, which was granted by Order dated February 9, 2018.

On June 5, 2018, the parties filed a Joint Motion to Extend Pretrial Deadlines. On June 29, 2018, an Amended Pretrial Scheduling Order was issued.

By Memorandum and Order dated July 23, 2018, the Court granted Plaintiffs' Motion for Leave to Amend the Complaint. Plaintiffs' Amended Complaint was filed on July 24, 2018. The Amended Complaint named Lt. Dreisbach as an additional Correctional Defendant and PA-C Mroz, R.N. Brigidi and Nicole Heffner as additional Medical Defendants.

A Stipulation to Strike was filed on July 27, 2018, whereby Plaintiffs and the Correctional Defendants and Lehigh County agreed that paragraphs 56-65 of the Amended Complaint would be stricken. Answers with Affirmative Defenses were filed on July 27, 2018 and July 30, 2018. By Order dated July 27, 2018, paragraphs 56-65 of the Amended Complaint were stricken.

On September 20, 2018, Plaintiffs filed an Unopposed Motion to Amend Pretrial Scheduling Order. A Second Amended Rule 16 Scheduling Order was issued on October 5, 2018. Pursuant to that Order, the Correctional Defendants and Lehigh County filed their Motion for Summary Judgment on December 19, 2018, the Medical Defendants and PrimeCare filed their Motion for Summary Judgment on January 7, 2019. Plaintiffs' Responses in Opposition were filed on January 23, 2019, and the Medical Defendants and PrimeCare filed a Response in Opposition to Plaintiffs' Additional Statement of Facts and Reply Brief in Support of their Motion for Summary Judgment on February 1, 2019.

III.    **STANDARD OF REVIEW.**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present specific facts showing that there is a genuine issue for trial and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325). The non-moving party has the burden of producing evidence to establish prima facie each element of its claim. *Celotex*, 477 U.S. at 322-323. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id.* at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987). When the non-moving party will bear the burden of proof at trial, the moving party's

burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case." *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting *Celotex*, 477 U.S. at 325).

## III. <u>DISCUSSION.</u>

Subject matter jurisdiction in this case is proper pursuant to 28 U.S.C. § 1331. Because Plaintiff's state law professional negligence, negligence, negligent infliction of emotional distress, wrongful death and survival action claims form part of the same case or controversy as the federal claims, subject matter jurisdiction over the state law claims is proper pursuant to 28 U.S.C. § 1367(a). Plaintiffs concede the dismissal of their civil rights claims in Counts I (against all Defendants) and III (failure to intervene against the individual correctional Defendants in their individual capacities).

Plaintiffs' remaining claims are: Count II (Deliberate Indifference pursuant to 42 U.S.C. § 1983 for denial of medical care against all Defendants in their individual capacities and PrimeCare), Count IV (Supervisory Liability pursuant to 42 U.S.C. § 1983 against Defendants Sweeney, Donate, and Dreisbach in their individual capacities), Count V (Municipal Liability pursuant to 42 U.S.C. section 1983 against Lehigh County and the individual correctional defendants in their individual capacities), Count VI (professional negligence against the individual medical defendants), Count VII (negligence - vicarious and corporate liability against PrimeCare), Count VIII (negligent infliction of emotional distress against all individual medical defendants and PrimeCare), Count IX (wrongful death against all Defendants) and Count X (survival against all Defendants).

**A.     Count II -  Section 1983, Eighth Amendment Deliberate Indifference - Denial of Medical Care - All Defendants in Individual Capacities and PrimeCare**

In Count II of Plaintiffs' Amended Complaint, Plaintiffs aver that all the

Defendants in their individual capacities and PrimeCare violated Inmate Williams' Eighth

Amendment rights by denying her medical care while she was in state custody.  In order to prove

an Eighth Amendment denial of adequate medical care violation arising from the conditions of

confinement, the plaintiff must show that the medical condition was "sufficiently serious,"

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991), and also that the defendant was "'deliberate[ly]

indifferen[t]' to inmate health or safety," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Deliberate indifference to the inmate's serious medical needs violates the Eighth Amendment,

"whether the indifference is manifested by prison doctors in their response to the prisoner's needs

or by prison guards in intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05.

In cases regarding medical care, the first (or objective) prong of the Eighth

Amendment test requires that the plaintiff show a serious medical need. In the instant case, it is

undisputed that Plaintiff's asthma was a serious medical need.  As to the second (or subjective)

prong of the Eighth Amendment test, mere errors in medical judgment or other negligent

behavior do not meet the *mens rea* requirement. *See Estelle*, 429 U.S. at 107.177 Rather, the

plaintiff must show subjective recklessness on the defendant's part.  "[A] prison official cannot

be found liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.178  However, the plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. In sum, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

The plaintiff can use circumstantial evidence to prove subjective recklessness: The jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. However, the jury need not draw that inference; "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Id.* at 844. The defendants "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.*179

A review of the record, making all reasonable inferences in the light most favorable to the Plaintiffs as the non-moving party as the Court is required to do, reveals genuine issues of material fact which preclude entry of summary judgment regarding this claim.

### 1. Correctional Defendants

The Lehigh County Defendants move for summary judgment of these claims.  A prison official acts with deliberate indifference only if an individual knows of and disregards an

excessive risk to inmate health or safety. Deliberate indifference requires some culpable state of mind. <u>Koukos v. Chester County</u>, Civ. A. No. 16-4602, 2017 WL 511634, at *4-5 (E.D. Pa. Feb. 7, 2017).

       The parties dispute whether Inmate Williams required urgent intervention during an asthma attack on the night of her death, and whether the failure to make medical treatment available, either through a nebulizer treatment, or a keep-on-person rescue inhaler, caused her death. The parties dispute whether, during the 3:00 p.m. to 11:00 p.m. shift on November 14, 2014, Inmate Martinez told C.O. Rodger that Inmate Williams was having trouble breathing. Inmate Martinez testified that she told C.O. Rodger that Inmate Williams was having difficulty breathing and needed a breathing treatment. Pl. Resp. CSOF 15 (citing Martinez Dep., pp. 22-26). C.O. Rodger denies that Inmate Martinez made such a statement to her. C.O. Chandler testified that Inmate Williams did not request a breathing treatment at any point during the 11:00 p.m. to 7:00 a.m. shift on November 11, 2014 to November 12, 2014, while she was conducting her rounds. CSOF 22 (citing Ex. G Chandler Incident Report, LCJ0031; Ex. I, Chandler Dep., p. 24.)

       The Correctional Defendants and Lehigh County argue that the submitted surveillance video contradicts the Plaintiffs' contentions that Inmate Williams and other inmates pleaded with C.O. Rodger and C.O. Chandler that Inmate Williams needed a breathing treatment. The Defendants note that the Supreme Court has said when there is reliable video footage that the Court, when ruling upon a motion for summary judgment, must view the facts in the light depicted by the videotape. ECF No. 63, pp. 11-12 (citing *Scott v. Harris*, 550 U.S. 372 (2007).

The Defendants contend that the videotape "clearly shows that the COs were regularly looking in and walking past the cells of both Inmate Williams and Inmate Martinez and no one was waiving them down or stopping them to talk." *Id.* Plaintiffs respond, however, that because there is no audio on the surveillance video, it is unclear how the video blatantly contradicts Inmate Martinez's testimony. Moreover, C.O. Rodger admitted that a portion of the video showing her stopping at Inmate Martinez's cell at 10:39 p.m. was consistent with her conversation with Inmate Martinez. ECF 70, p. 11 (citing Rodger Dep., pp. 46-47.) Taking the evidence in the light most favorable to Plaintiffs, a reasonable jury might credit Inmate Martinez's testimony. Summary judgment as to the Correctional Defendants and Lehigh County will be denied as to Plaintiffs' claims in Count II of the Amended Complaint.

### 2. Individual Medical Defendants and PrimeCare

To hold a private corporate defendant liable under section 1983, a plaintiff must show that the corporation was acting under the color of law and that the constitutional violation arose from the corporation's official policy or custom. *Milliner v. Diguglielmo*, 2011 WL 2357824, at *6 (E.D. Pa. June 8, 2011)(citing *Natale v. Camden County Corr. Facility*, 318 F.3d 574, 583-83 (3d Cir. 2003)). Any violation of a plaintiff's rights must have been done intentionally or with deliberate indifference to those rights. *Summers v. City of Phila.*, Civ. A. No. 17-191, 2017 WL 2734277, at *3 (E.D. Pa. June 26, 2017). Failure to provide adequate medical care is actionable under section 1983 as a violation of the Eighth Amendment if the failure results from the deliberate indifference to a prisoner's serious illness or injury. *Personacare of Reading, Inc. v. Lengel*, Civ. A. No. 16-1965, 2017 WL 1036154, at *2 (E.D. Pa.

Mar. 17, 2017). The "deliberate indifference" standard is applied regardless of a plaintiff's status. *Randall v. County of Berks*, Civ. A. No. 14-15091, 2015 WL 5027542, at *9-10 (E. D. Pa. Aug. 24, 2015).

The Individual Medical Defendants and PrimeCare move for summary judgment of Plaintiffs' claims for denial of medical care. Plaintiffs contend that during the overnight hours of Inmate Williams' death, CO Chandler allegedly called the medical department but was informed by an unknown person in the medical department that there was only one person in the department and they were too busy to see Inmate Williams because several other patients were being seen at that time. R.N. Brigidi denies that she was called by a correctional officer about Inmate Williams. Both CO Rodger and CO Chandler testified that they did not call R.N. Brigidi about Inmate Williams. The Medical Defendants contend that any purported statements by the an unidentified person in the medical department are inadmissible hearsay and insufficient to overcome a motion for summary judgment.

In response, Plaintiffs contend that the purported statement by an unidentified person in the medical department to one of the corrections officers falls under the present sense impression exception of the rule against hearsay. Federal Rule of Evidence 803(1) provides an exception to the hearsay rule for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed.R.Evid. 803(1).

The subject statement is not the only basis for Plaintiffs' claims against PrimeCare and the Medical Defendants. Plaintiffs also take issue with the policy of not providing a Keep-on-Person rescue inhaler to Inmate Williams as treatment for her known asthma attacks. Inmate

Williams' asthma was assessed from the first day that she entered Lehigh County Prison. Although she entered the Prison with neither an inhaler nor a valid prescription for an inhaler, she was prescribed medication to address her asthma in the form of nebulizer treatments and the condition was routinely evaluated. The records show that Inmate Williams went months at a time without a breathing treatment. Regarding Plaintiffs' issue with the practice of prescribing nebulizer treatments as opposed to Albuterol inhalers for inmates with a history of asthma, the Medical Defendants contend that this is a difference of opinion as to treatment rendered and the method of application of identical medication. Defendants contend that the failure to provide a rescue inhaler does not demonstrate deliberate indifference.

Plaintiff contends, and the moving Medical Defendants contest, that the National Commission on Health Care ("NCCHC") standard for medical care required that a Keep on Person inhaler be made available to asthmatic inmates.[1] ECF 72, p. 10 (citing ECF 74, Ex. J, p. 6; Ex. K, Heffner Dep., pp. 32-35.) Plaintiffs contend that the last Lehigh County NCCHC accreditation report which was issued four months prior to Inmate Williams' death, states that LCJ met the NCCHC's Standard J-D-02 which required that a Keep on Person rescue inhaler be made available to inmates. *Id.* Plaintiffs contend that the standard was not met in the case of Inmate Williams and note that PrimeCare's R.N. Brigidi testified that non-federal inmates were never given Keep on Person rescue inhalers. *Id.* at p. 11 (citing Brigidi Dep., pp. 13-16.) Plaintiffs argue that if R.N. Brigidi's testimony is credited, the Medical Defendants and

---

[1]    The National Commission on Correctional Healthcare ("NCCHC") is the national governing body responsible for overseeing the delivery of prison health care and for accrediting the Lehigh County Prison. *See Schuenemann v. U.S.*, Civ. A. No. 05-2565, 2016 WL 408404, at *4 (3d Cir. 2006)(noting NCCHC; ECF No. 64-1, Ex. EE.

18

PrimeCare were not meeting the J-D-02 Standard with respect to non-federal inmates such as Inmate Williams, which is sufficient evidence for a reasonable jury to find deliberate indifference. In Reply, the Medical Defendants and PrimeCare contest the accuracy of Plaintiffs' quotation of the actual standard or the compliance indicators, which they attach to the Supplemental Appendix filed with their Response to Plaintiffs' Additional Statement of Facts.

The differences in the Standard are reflected in differences in testimony among the employees of PrimeCare and another witness: R.N. Brigidi testified that county inmates are not permitted to possess rescue inhalers but federal inmates are permitted such inhalers because they are housed one inmate per cell (Brigidi Dep., pp. 13-16); PA-C Mroz testified that rescue inhaler policies varied in different PrimeCare facilities (Mroz Dep., p. 17); PrimeCare's Health Services Administrator Nicole Heffner testified that she was unaware of any rescue inhaler policies distinguishing between federal and county inmates (Heffner Dep., pp. 35-36); and PrimeCare's corporate designee Thomas Weber testified that there is no distinction between county and federal inmates and R.N. Brigidi was incorrect in her understanding of policies at LCJ (Weber Dep., pp. 20-21).

The variances in the above testimony and whether the NCCHC Standard required or did not allow for rescue inhalers to be kept on inmates and whether that standard was met at LCJ provides a sufficient material issue of fact precluding entry of summary judgment on the issue of whether the Medical Defendants and PrimeCare were deliberately indifferent to Inmate Williams. Summary judgment will be denied.

**B**.     **Count IV - Section 1983 Supervisory Liability Against Sweeney, Donate and
Dreisbach in their Individual Capacities**

Plaintiffs assert claims in Count IV of the Amended Complaint against Edward
Sweeney who, at the time of Inmate Williams' death in November, 2014, was the Director of
Corrections for Lehigh County, Warden Janine Donate, and Lieutenant Dreisbach.   The
Defendants first claim that they are entitled to summary judgment because there was no violation
of Inmate Williams' constitutional rights fails because it has been determined that material issues
of fact exist to preclude summary judgment on the deliberate indifference claim.  Next,
Defendants contend that summary judgment should be entered on Plaintiffs' Section 1983
supervisory liability claim because they had no personal involvement in the alleged wrongdoing
against Inmate Williams, they had no affirmative conduct that played a role in violating Inmate
Williams' right to adequate medical care, that they did not direct others to violate her rights, and
that they had never met Inmate Williams.  They also deny having knowledge of or acquiescing in
subordinates' alleged violations of Inmate Williams' civil rights.  Defendants contend that
nothing in the record supports a finding that they took any affirmative steps resulting in a
violation of Inmate Williams' constitutional rights.

Defendants rely on *Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d Cir. 1990)
and *Evancho v. Fisher,* 423 F.3d 347 (3d Cir. 2005)*,* for their position that supervisory liability
cannot be based solely on respondeat superior and a defendant must have personal involvement
in alleged wrongdoing to be held liable under Section 1983, but those cases dealt with Title VII
sexual harassment in employment and whether Section 1983 liability can be predicated solely on
*respondeat superior* without any involvement or knowledge on the part of the defendant.  The

Third Circuit in *Evancho* held that Section 1983 requires a defendant's "personal involvement" in the wrongdoing and "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* at 353 (quoting *Rode v Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiffs claim that "a jury is free to consider circumstantial evidence to decide if a custom existed whereby inmates would not receive adequate medical care." Resp., p. 13. Plaintiffs argue that if a jury credits Inmate Martinez's testimony and concludes that one or more of the Corrections Officers were aware of Inmate Williams' breathing problems and did not address her serious medical need, this is an example of deliberate indifference. Plaintiffs further contend that the supervisory policy or practice that these Defendants failed to employ was the failure to have a clearly understood policy and procedure for the provision of Keep on Person rescue inhalers to inmates despite such policy being a requirement for accreditation pursuant to NCCHC standards, and the County's representation to NCCHC that it met this standard. Plaintiffs further state that the death of a male inmate allegedly due to asthma two years prior to Ms. Williams' incarceration "should have placed the issue of Keep on Person rescue inhalers in the crosshairs" of Lehigh County Prison supervisors.

In *Andrews v. Kenney*, Civ. A. No. 16-1872, 2017 WL 2591931 (E.D. Pa. June 14, 2017), the Honorable Gene E.K. Pratter explains the four-part test for determining whether an official may be held liable on a claim for failure to supervise. Following a plaintiff's identification of a supervisory policy or practice that the supervisor failed to employ, the plaintiff must prove that:

> (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

*Id.* at *3 (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989); *Brown v. Muhlenberg Twp.*, 269 F.3d 205 (3d Cir. 2001)).  Taking the facts in the light most favorable to Plaintiffs, the death of a male inmate allegedly due to asthma two years prior to Inmate Williams' incarceration "should have placed the issue of Keep on Person rescue inhalers in the crosshairs" of LCJ supervisors and the failure to have a clearly understood policy and procedure for the provision of Keep on Person rescue inhalers to inmates is attributable to Edward Sweeney, the former Director of Corrections for Lehigh County, Warden Janine Donate, and Lieutenant Dreisbach, summary judgment on the Section 1983 supervisory liability claim must be denied.

### C.    Count V - Section 1983 Municipal Liability Against Lehigh County and Individual Correctional Defendants in their Official and Individual Capacities

Lehigh County and the Individual Correctional Defendants move for summary judgment on the municipal liability claims against them.  Pursuant to *Monell v. Dep't of Soc. Serv. of N.Y.C.*, 436 U.S. 658 (1978), liability for Lehigh County and the Individual Correctional Defendants cannot be predicated on a theory of *respondeat superior* or vicarious liability.  *A.M. ex. Erl. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004).  Plaintiffs' *Monell* claims against the Individual Correctional Defendants in their Official Capacity is another way of pleading an action against an entity of which an officer is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Thus, summary judgment will be granted on the Section 1983 municipal liability claims against the Individual Correctional Defendants in their Official

Capacities.

In order to demonstrate municipal liability for a 1983 constitutional violation, a plaintiff must identify a municipal policy or custom that caused the constitutional violation. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)(citing *Bd. of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown*, 520 U.S. 397, 403 (1997)); *Miller v. Corr. Med. Sys., Inc.*, 802 F.Supp. 1126, 1132 (D. Del. 1992)(This principle applied to private enterprises offering services on behalf of municipality.) Courts have identified three fact patterns whereby the acts of municipal personnel may be imputed to a policy or custom of a municipal entity, rendering the municipal entity liable under § 1983: (1) "where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy;'" (2) "where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;'" and (3) "where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Greygor v. Wexford Health Sources, Inc.*, No. CV 14-1254, 2016 WL 2866696, at *14-17 (W.D. Pa. May 17, 2016)(citing *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)(quoting *Bryan Cnty.*, 520 U.S. at 417-18). "[A] claimant must also establish that the municipal policy or custom was the proximate cause of his or her injuries." *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)(quoting *Pembauer v City of Cincinnati*, 475 U.s. 469, 481 (1986)). "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" *Id.*

(quoting *Bryan County*, 520 U.S. at 404). A claimant "must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's policy or custom and the specific deprivation of constitutional rights at issue." *Id. (*citing *Id.)* If the link is not too tenuous, the jury should be left to decide whether the municipal entity's policy or custom caused the alleged constitutional violation. *Id.* (citing *Id.*) The Amended Complaint alleges the following:

> Prior to the month of November, 2014, Lehigh County developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in their custody or control, which caused the violation of [Ms. Williams'] federally protected rights.

> It was the policy and/or custom of Lehigh to inadequately train, retrain and supervise its staff, including the individual Defendants, as well as failing to properly screen prospective employees prior to hiring; thereby failing to adequately discourage constitutional violations on the part of its staff in general and the individual Defendants in particular.

> Defendant Lehigh County failed to adequately screen PrimeCare prior to entering into a contractual relationship with it; failed to adequately supervise the performance of PrimeCare with respect to its contractual duties; and/or ratified PrimeCare's unlawful acts and omissions by continuing to do business with it.

> Defendant Lehigh County did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein.

> As a result of the above described policies and customs and failure to adopt necessary and appropriate policies, staff of Defendant Lehigh County, including the individual Defendants, believed that their actions would not be properly monitored by supervisory officers and that unsafe acts or misconduct would not be investigated or punished, but would be tolerated.

> The above described policies and customs, the failure to adopt necessary and appropriate policies, and/or the ratification of the actions by employees and

contractors of Lehigh County demonstrated a deliberate indifference on the part of the policymakers of the Defendant Lehigh County and were the cause of the violation of [Ms. Williams'] rights as alleged herein, and the damages that resulted therefrom.

Am. Compl., pp. 22-24 ¶¶ 93-98. Lehigh County and the Correctional Defendants move for summary judgment on the basis that Plaintiffs have failed to identify a custom or policy of Lehigh County that "caused" Inmate Williams' death and have failed to bring forth any evidence to support a finding that a policy, practice, or custom of Lehigh County resulted in a violation of Inmate Williams' constitutional rights. They note that Plaintiffs did not seek discovery of the written policies of Lehigh County or PrimeCare and there is no "custom" at LCJ of denying breathing treatments because it is undisputed that Inmate Williams was provided a breathing treatment every time she requested one.

Despite Plaintiffs numerous allegations in the Amended Complaint as set forth above, it appears that Plaintiffs only contend that there was no clearly established or understood policy respecting possession of Keep on Person rescue inhalers by inmates. Plaintiffs note the following differences in testimony among the following Correctional Defendants, employees of PrimeCare and another witness: Former Director of Corrections Sweeney testified there were no restrictions on inmate possession of rescue inhalers (Sweeney Dep., p. 14); Warden Donate testified there was no specific policy regarding rescue inhalers, because that was a PrimeCare decision (Donate Dep., pp. 18-19); former Lt. Dreisbach testified that rescue inhalers are kept in the control booth of certain units but that on other units, inmates have them in their cells (Dreidbach Dep., pp. 30-32); Investigator Knappenberger was unaware of a specific policy regarding rescue inhalers but thought one existed somewhere (Knappenberger Dep., pp. 19-20);

CO Rodger testified that she was unaware of a specific rescue inhaler policy, but generally understood that inmates could possess them as long as their name was written on the inhaler and the box (Rodger Dep., pp. 18-20); CO Chandler testified that inmates were not permitted to carry rescue inhalers and she had never seen one on a housing unit (Chandler Dep., pp. 18-20); R.N. Brigidi testified that county inmates are not permitted to possess rescue inhalers but federal inmates are permitted such inhalers because they are housed one inmate per cell (Brigidi Dep., pp. 13-16); Jennifer Mroz, PrimeCare's Director of Clinical Operations, testified that rescue inhaler policies varied in different PrimeCare facilities (Mroz Dep., p. 17); PrimeCare's Health Services Administrator Nicole Heffner testified that she was unaware of any rescue inhaler policies distinguishing between federal and county inmates (Heffner Dep., pp. 35-36); and PrimeCare's corporate designee Thomas Weber testified that there is no distinction between county and federal inmates and R.N. Brigidi was incorrect in her understanding of policies at LCJ (Weber Dep., pp. 20-21).

In response to the Correctional Defendants motion for summary judgment, Plaintiffs contend that a reasonable jury could find *Monell* liability in Lehigh County's failure to have a clearly understood policy in place allowing for inmates to possess Keep on Person rescue inhalers, even if the jury does not credit the testimony of Inmate Martinez and finds that Lehigh County employees were unaware of Inmate Williams' breathing difficulty on the night of November 11, 2014. Plaintiffs again cite the death of a male inmate allegedly due to asthma two years prior to Inmate Williams' incarceration "should have placed the issue of Keep on Person rescue inhalers in the crosshairs" of LCJ supervisors and also Inmate Martinez's testimony that Inmate Williams was having difficulty breathing and that both Inmate Williams herself and

Inmate Martinez on Inmate Williams' behalf asked for treatment for Inmate Williams.

The Court finds that when viewed in the light most favorable to Plaintiff, a reasonable juror could conclude that the lack of a clearly established or understood policy respecting possession of Keep on Person rescue inhalers by inmates created a situation in which the risks to Inmate Williams' serious medical needs were sufficiently obvious as to constitute deliberate indifference. The motion for summary judgment as to Section 1983 Municipal Policy as to Lehigh County and the Individual Correctional Defendants in their Individual Capacities will be denied.

### D. Qualified Immunity

Qualified immunity shields government officials from performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights known to a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is the defendants' burden to establish that they are entitled to such immunity. *See Stoneking v. Bradford Area School District*, 882 F.2d 720, 726 (3d Cir. 1989).

Courts apply a two-step inquiry to determine whether a defendant is entitled to qualified immunity. The two-pronged inquiry is "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *Walker v. Coffey*, 144 (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F,3d 235, 241 (3d Cir. 2016)). First, a court must determine whether a constitutional right was violated. Second, a court must determine whether the right was clearly established such that a reasonable officer would have known the conduct violated their rights. *Saucier v. Katz*, 533 U.S.

27

194, 201-02 (2001). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court found a court may address whether a right was clearly established before addressing whether a constitutional right was violated. "Under the test announced in *Harlow*, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed they had handled the incidents properly are irrelevant." *Stoneking*, 882 F.2d at 726 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The Individually named Correctional Defendants argue that they are entitled to qualified immunity. Because it is in dispute whether the Correctional Defendants were deliberately indifferent to Inmate Williams' serious medical needs and such an Eighth Amendment right to adequate health care "has been clearly established for years," the Correctional Defendants are not entitled to qualified immunity.

### E. Counts VI - Professional Negligence Against Individual Medical Defendants Except PrimeCare and Count VII - Vicarious and Corporate Liability Against PrimeCare

Under Pennsylvania law, to state a *prima facie* case of medical malpractice, or professional negligence, a plaintiff must provide a medical expert who will testify as to the applicable standard of care, or duty, that the physician owed the patient, that the physician breached that standard of care, and that the breach was the proximate cause of the harm suffered. *Miville v. Abington Mem. Hosp.*, 377 F. Supp.2d 488, 490-91 (E.D. Pa. 2005). Federal Rule of Evidence 601 mandates that state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision. *Id.*

The Medical Defendants generally contend as to both claims in Counts VI and VII

that Plaintiffs must support their claim for medical professional liability with an expert witness

who meets the requirements of Section 512 of the Pennsylvania Medical Care Availability and

Reduction of Error Act ("MCARE Act"). *See* 40 P.S. § 1303.512. Section 512 sets forth the

general rule in this regard:

> (a) General rule. No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> (b) Medical testimony. . An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
> > (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
> >
> > (2) Be engaged in or retired within the previous five years from active clinical practice or teaching. Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

40 P.S. § 1303.512 (a) and (b).  As to standard of care expert testimony in particular, Section

512(c) states:

> (c) Standard of Care. In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
>
> > (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard care.
> >
> > (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsections (d) or (e).

> (3) In the event the defendant physician is certified by an approved board,
> be board certified by the same or similar approved board, except as
> provided in subsection (e).

40 P.S. § 1303.512(c). Plaintiffs' only expert is John Shane, M.D. Dr. Shane is a board certified pathologist. Further, his CV is void of any reference to practicing either internal or family practice medicine. The Medical Defendants contend that Dr. Shane is not competent to testify as to professional negligence and therefore the claims in Counts VI and VII of the Amended Complaint must be dismissed.

Alternatively, the Medical Defendants submit that Dr. Shane is not qualified to render an opinion as to any PrimeCare policy, procedure or practice because Dr. Shane has never practiced correctional medicine nor has he formulated any policies or procedures in that area. Specifically, they argue that he has no understanding as to the security issues related to rescue inhalers and the potential for the inhalers' misuse. Thus, they contend that without a basis of this knowledge, Dr. Shane cannot provide any opinion as to correctional medicine standards and how it relates to the treatment of asthma.

*Estate of Goldberg v. Nimoityn*, 193 F. Supp. 3d 482 (E.D. Pa. 2016), is instructive on the issue of whether an otherwise qualified physician can render an opinion on the standard of care under MCARE even in the absence of board certification. In that professional negligence case in which it was alleged that a physician wrongfully refused to arrange for implantation of a feeding tube as the patient deteriorated and resulted in her death, the Honorable Gerald A. McHugh held that an otherwise qualified physician, even in the absence of board certification, could render an opinion on the standard of care under MCARE. An objection was

made to the professional qualifications of the plaintiff's expert because he lacked board certification, and Judge McHugh examined whether the doctor was qualified, noting that any deficit in his certification was a technical one at best and the doctor's extensive experience in treating elderly patients in settings where patient competence and the need for supportive care routinely arise. *Id.* at 488-492. Judge McHugh noted that the extent of the doctor's expertise in the hospital setting would be an appropriate focus of cross-examination, but that the doctor possessed the qualifications to render the opinions set forth in his report, therefore he denied the motion for summary judgment as to professional negligence. *Id.* at 491-92.

In this case, Plaintiffs contention that the statements by Lehigh County and PrimeCare that PrimeCare has complete medical autonomy and is able to prescribe, diagnose, and treat inmate/patients as if they were treating a patient not in prison belies the argument that Dr. Shane is not competent to render an opinion as to the quality of care because he does not practice in a correctional facility. Dr. Shane is a board certified pathologist. The extent of the doctor's expertise in a correctional facility is an appropriate focus of cross-examination. Summary judgment as to the Plaintiffs' claims in Counts VI and VII for negligence is denied.

F.   **Count VIII - Negligent Infliction of Emotional Distress Against All Individual Medical Defendants and PrimeCare**

In Count VIII of the Amended Complaint filed on July 24 2018, Plaintiffs aver that: "[a]s a direct and proximate result and consequence of the . . . conduct, and acts and omissions of the Defendants, Plaintiffs have suffered severe emotional distress, which has manifested itself in numerous physical symptoms, including, *inter alia*, stress, nervousness,

anxiety, and insomnia." Am. Compl., p. 30 ¶ 115. "In order raise a claim for [negligent infliction of emotional distress] NIED, a plaintiff must demonstrate one of four factual scenarios: (1) the defendant owed a fiduciary duty toward the plaintiff; (2) the plaintiff suffered a physical injury that caused emotional distress; (3) the plaintiff was in the "zone of danger" of the defendant's tortious conduct; or (4) the plaintiff witnessed a serious injury to a close family member." *Doe v. Phila. Cmty. Health Alt. AIDS Task Force*, 745 A.2d 25, 27 (Pa. Super. 2000). The Individual Medical Defendants and PrimeCare move for summary judgment on the NIED claim because the record is devoid of any evidence that Inmate Williams suffered physical harm as a result of emotional distress.

In response to the Defendants' argument, the Plaintiffs claim that their expert, Dr. Shane, has explained that Inmate Williams did not die instantly, but he opines that she died from an acute asthma attack which "is extremely painful both physically and emotionally." Pls.' Resp., p. 12 (citing Ex. A, p. 2). He further opines that "[t]here is increased pressure in the chest with severe pain on exhalation. The emotional component is a sensation of impending doom." *Id.* Thus, summary judgment is denied as to Plaintiffs' NIED claim.

### G. Counts IX and X - Wrongful Death and Survival Claims Against All Defendants.

Lehigh County and the Correctional Defendants move for summary judgment of the claims against them as barred by the Pennsylvania Political Subdivision Tort Clams Act ("PSTCA"), 42 Pa. C.S.A. § 8541, *et seq*. Plaintiffs aver that their wrongful death and survival claims are not barred by the PSTCA because those claims arise out of intentional torts or willful misconduct. Dkt. 70, Pls.' Resp., p. 20 (citing *Heckenswiler v. McLaughlin*, 517 F. Supp.2d 707

(E.D. Pa. 2007); 42 Pa. C.S.A. § 8542(a)(2)).  The general provision with respect to governmental immunity dictates that:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damage on account of any injury to a person or property caused by any act of the local agency or any employee thereof or any other person.

42 Pa. C.S.A. § 8541. In order for a claim to be maintained against a local agency, two conditions must first be met. First, the damages sought in the present suit must be recoverable under the common law, or a statute creating a cause of action absent the defenses provided in the act; and second, that Plaintiff's injury "was caused by the negligent acts of the local agency or employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (d)." 42 Pa. C.S.A. § 8542(a).

Section 8542(b) provides that a local governmental agency is immune from any suit based upon the negligent acts of the agency or employee, unless the cause of action relates to one of eight categories. The eight enumerated exceptions to immunity are: (1) vehicle liability; (2) the care, custody or control of personal property; (3) the care, custody or control of real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; or (8) the care, custody or control of animals. 42 Pa. C.S.A. § 8542(b). These exceptions are to be narrowly construed. *See Mascaro v. Youth Study Ctr.*, 514 Pa. 351, 523 A.2d 1118, 1123 (1987).  Defendants contend that none of the exceptions apply in the present case and that Plaintiffs' claims against Lehigh County are barred. ECF 63, pp. 23-24. Moreover, Defendants contend that because "the liability of local agency employees cannot exceed the liability of their employing agency," then the Individual Defendants, former Director Sweeney,

Warden Donate, CO Chandler, CO Rodger and Lt. Dreisbach also cannot be liable. *See* 42 Pa. C.S.A. § 8545.

Plaintiffs respond that the PSTCA does not bar wrongful death and survival actions against municipal defendants where the conduct involves intentional torts or willful misconduct. ECF 70., p. 20. To the extent that the failure to provide medical treatment to an inmate having difficulty breathing constitutes willful misconduct, Plaintiffs' claims against the Correctional Defendants and Lehigh County fall within the exception to the PSTCA and summary judgment will be denied on Plaintiffs' Pennsylvania state law wrongful death and survival action claims in Counts IX and X of the Amended Complaint.

### H.    Punitive Damages

Plaintiffs also claim punitive damages against the individual Defendants in their individual capacities and PrimeCare jointly and severally. Am. Compl. Defendants move for summary judgment on this damages claim.

"Both the United States Supreme Court and the Supreme Court of Pennsylvania precedents prohibit the assessment of punitive damages against public entities." *Keohane v. Lancaster County*, 2010 WL 3221861, at *18 (E.D. Pa. Aug. 13, 2010)(quoting *Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp.2d 622, 629 (E.D. Pa. 2006)). Therefore the punitive damages claim against Lehigh County will be dismissed.

Punitive damages in § 1983 cases are available when an individual defendant has acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." *Id.* (quoting *Keenan v. City of Phila.*, 983 F.2d 459 (3d Cir. 1992)). "Whether conduct rises to

that level is for the jury to decide." *Id.* (citing *Woolfolk v. Duncan*, 872 F Supp. 1381, 1392 (E.D. Pa. 1995)). Taking the facts in the light most favorable to the Plaintiffs, because a reasonable jury may find that the conduct of the Defendants rose to the level of callous indifference to Inmate Williams' need for medical care, the claim for punitive damages survives the motion for summary judgment as to all other Defendants except Lehigh County.

IV.  **CONCLUSION.**

Based on the foregoing, summary judgment will be granted on the *Monell* claims against the individual Correctional Defendants in their Official Capacities and on Plaintiffs' claims for punitive damages against Lehigh County. Summary judgment is otherwise denied.

An appropriate Order follows.